## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE SCHOOL DISTRICT OF PHILADELPHIA, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | _____ |
| THE CITY OF PHILADELPHIA, THE CITY OF PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH, MANAGING DIRECTOR TUMAR ALEXANDER, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

1.      On June 1, 2022, City of Philadelphia Bill No. 210685-AA was signed into law (the "Bill").  The Bill amends Section A-703 of the Philadelphia Administrative Code ("Section A-703") to require the School District of Philadelphia (the "District") to obtain from the City of Philadelphia (the "City") a "Special Certificate of Inspection" ("Certificate") attesting to the District's compliance with a set of undefined "best practices" for asbestos and other unspecified "property-related hazards" to be recommended by an advisory board composed almost entirely of appointees with no required scientific, technical, or environmental expertise, or relevant licensing.

2.      The Bill was enacted despite the fact that the District already is subject to state and federal standards associated with the management of lead, asbestos and other environmental hazards that are intended for protection of health, safety, and welfare.

3.      The Bill suggests that without the City's approval and issuance of the Certificates, the District school buildings cannot be occupied for the coming applicable school year.  Thus, the Bill and Section A-703 threaten to terminate in-person learning and support for the more-than-130,000 students attending District schools in Philadelphia based on vague, undeveloped, and unidentified practices adopted under the ambiguous authority and unspecified expertise of the City's Managing Director.

4.      Indeed, the first 100 school buildings will purportedly require such Certificates to open for the 2023–2024 school year notwithstanding the fact that there currently are no known members of the advisory board and no defined "best practices," which pursuant to the Bill need not be supported by scientific evidence and may remain undisclosed until six months before the first compliance deadline of August 1, 2023.

5.      The Bill follows consecutive school years marred by the Covid-19 pandemic when  the District was forced to close school buildings to in-person instruction, resulting in far-reaching impacts on school children not only in a reduction of learning opportunities and advancement, but also in a loss of social, emotional and health supports.

6.      In a particularly counterproductive move, the City paired its enactment of the Bill with funding cuts to the District's annual operating budget, thus limiting the funds the District could  use to meet the newly imposed oversight requirements even if they were lawful, which they are not.

7.      The Bill purports to provide the City with the unfettered ability to dictate the District's operational decisions and close District school buildings with little to no notice to the District.  The City lacks the authority for such a broad over-regulation of the District's operations.  For the reasons that follow, the Bill must be declared preempted, unconstitutional,

2

and invalid, and the City and its co-defendants must be enjoined from enforcement of the Bill and Section A-703.

## PARTIES

8.      Plaintiff the School District of Philadelphia is a separate and independent Home Rule School District under Pennsylvania Law, governed by its own Board of Education.  The District's headquarters is located at 440 North Broad Street, Philadelphia, Pennsylvania 19130.

9.      Defendant the City of Philadelphia is a municipal corporation of the first class of the Commonwealth of Pennsylvania under the First-Class City Home Rule Act of 1949.

10.      Defendant the City of Philadelphia Department of Public Health is an agency of Defendant the City of Philadelphia, a city of the first class in the Commonwealth of Pennsylvania.

11.      Defendant Managing Director of the City of Philadelphia, Tumar Alexander, is an appointed officer of Defendant the City of Philadelphia, with the offices of the Managing Director located at 1401 John F. Kennedy Boulevard, Suite 1430, Philadelphia, Pennsylvania 19102.

## JURISDICTION & VENUE

12.      This Court has subject matter jurisdiction over this matter which arises under the United States Constitution and the federal laws of the United States and includes additional state law claims arising under the same case and controversy.  28 U.S.C. §§ 1331; 1367.

13.      Venue is proper in this Court as all parties are located within the Court's district.

## FACTUAL BACKGROUND

**A.     The District And Its Students**

14.     The District owns more than 300 buildings which serve over 130,000 students every year.  Of the District's 300 buildings, more than 40 buildings are over 100 years old, and the average age of the buildings is over 65 years old.

15.     The City of Philadelphia is known as the "poorest" large city in the country, with a poverty rate of 23.3% in 2019.  87% of the District's students are recognized as minority, and over 70% are economically disadvantaged.

16.     In addition to educational instruction, the District provides physical, behavioral, and mental health services, medical coordination and support, free meals, and after-school and summer activities for many of its students, all of which support working parents and caregivers, improve academic, social, and personal development and help children stay safe and avoid high-risk behaviors.

17.     The District has suffered from decades of systemic underfunding.  Unlike other school districts in the Commonwealth, it is not a taxing authority and cannot itself impose on residents a school tax to ensure that sufficient funding exists to meet its obligations.  Instead, the District must rely on the monies allocated to it by federal, local, and state authorities, including the City. On average, the District receives approximately $6,500 less per-student than surrounding Pennsylvania school districts.

18.     The operating budget for the District is largely non-discretionary, with required expenditures dedicated to charter school funding, other non-district school funding, administrative expenses, debt service, teacher and staff salaries and benefits, pension contributions, and transportation.

4

19.     Only a small percentage of the District's operating budget is available to be allocated for maintaining and improving the facilities and utilities of the District's aging school buildings.

**B.      The District is Subject to Existing Federal and State Asbestos and Environmental Laws and State and Local Regulations**

20.     The District is subject to a myriad of federal, state, and local laws and regulations that relate to building conditions and environmental hazards such as lead-based paint, lead-in-water, and asbestos.  Though the scope of work is challenging given the District's limited recurring resources and funding, the District strives diligently to comply with these laws and regulations.

21.     With regard to asbestos management in particular, the District is subject to the federal Asbestos Hazard Emergency Response Act ("AHERA") and the federal Asbestos School Hazard Abatement Reauthorization Act ("ASHARA").

22.     AHERA provides the framework for the District's management program for asbestos containing building material ("ACBM"), and AHERA requires that school districts, generally referred to in AHERA as Local Education Agencies ("LEAs"), inspect their buildings for ACBMs, implement asbestos response actions where appropriate, safely maintain ACBMs, and develop, maintain, and update asbestos management plans for school buildings under the LEA's control.

23.     AHERA requires that all school districts have an accredited asbestos inspector conduct an asbestos inspection of each school building.  Re-inspection of each building is required to occur every three years, with periodic surveillance in each building at least once every six months.  Each inspection and re-inspection must be documented in writing and must be approved by the accredited inspector.  All recommendations for response action must be

approved by an accredited management planner.  The asbestos management planner prepares the official asbestos management plan for each school building.  AHERA vests authority in LEAs, such as the District, to select appropriate response actions based on the recommendations of the certified management planner.

24.     Pennsylvania additionally requires that asbestos abatement workers be certified and licensed through the Pennsylvania Department of Labor and Industry.

25.     The City of Philadelphia further requires that asbestos abatement workers, including investigators, inspectors, and contractors, operating in the City obtain additional licenses and certifications through the City's Department of Public Health.

26.     Since AHERA's enactment in the 1980s, the District has made sustained efforts to comply with AHERA and all the Commonwealth's and the City's licensing, accreditation, and certification requirements related to the qualification of asbestos inspectors, investigators, and contractors.

27.     The District's limited resources as well as the limited availability of asbestos contractors and inspectors with the necessary Pennsylvania and Philadelphia accreditations, approvals and certifications historically have been major strains on the District's ability to keep up with AHERA's rolling three-year cycle of compliance for its more-than-300 school buildings.

**C.     The District's AHERA Compliance Program**

28.     Under existing AHERA regulations, each of the District's more-than-300 school buildings must be inspected at least once every 3 years, resulting in over 100 required inspections a year, on average.

6

29.     Each 3-year building inspection takes multiple days to complete and is performed by multiple Pennsylvania accredited building inspectors.  The City has taken the position that the District's building inspectors must also be Philadelphia-certified Asbestos Investigators.

30.     In addition to the required 3-year building inspections, AHERA requires the District to perform periodic surveillance inspections in every school building at least once every 6 months.  Thus, in any given year, the District is required to visit approximately 600 school buildings for asbestos inspection and surveillance, with these visits sometimes lasting multiple days.  This figure does NOT include visits to school buildings for asbestos abatement and removal.

31.     In addition to the proactive AHERA inspection and surveillance processes, the District also encourages building occupants to report damage of confirmed or suspected ACBM to the school's Building Engineer ("BE") or using the District's internal work order system, as soon as possible.  For reports of damage to confirmed ACBM, or suspected ACBM that is confirmed to be asbestos by an inspector, or if damaged ACBM is identified during an AHERA inspection or surveillance, a response action is developed to repair, encapsulate, or remove the ACBMs.  When the damage is reported by independent Asbestos Investigators, the response action recommendation is provided to the District using the District's Design Data Collection ("DDC") form. Work orders are routinely generated for response actions that will be performed by the District's internal abatement team, or for damage reported by school personnel.

32.     Before work commences, the District submits any required notifications to the City Health Department's Air Management Services group ("AMS") to identify the certified Asbestos Project Inspector ("API") who will oversee the project and conduct air sampling.

7

33.     For each approved work order, the District's abatement team or another appropriately licensed and certified contractor performs the work under the supervision of the API.  Depending upon the size of the abatement, and in accordance with the City of Philadelphia's Asbestos Control Regulation ("ACR"), APIs may be required to collect background air samples, observe the initial cleaning of the area and erection of containment, collect air samples during the abatement work, monitor the containment including the negative air pressure area, visually inspect the area following abatement, conduct final clearance air sampling, and prepare a report on the abatement activities, including the results of air sampling and any potential noncompliance with local, state, or federal regulations.  API reports are reviewed by the District's management planners.  Information from an API report is incorporated into the AHERA management plan for an affected school.

34.     The District employs a number of in-house AHERA management planners and licensed asbestos inspectors, as well as an abatement team.  However, the District cannot rely solely on in-house resources to meet AHERA and ACR requirements, so the District relies heavily on the use of third-party experts, consultants, and contractors to implement its asbestos management program.

35.     Though nebulous, the City's Bill and Section A-703 appear poised to hamstring the District's existing compliance program by pulling staff and contractors away from abatement and removal projects and from the more-than-600 inspection and surveillance visits during each year to respond to the City's new program.  Moreover, to implement its unnecessary oversight program, the City likely will need to retain some of the same, limited pool of third-party contractors on whom the District is already relying for its compliance program.

D.     **Section A-703 of the Philadelphia Administrative Code and City of Philadelphia Bill No. 210685-AA**

36.     Section A-703 of the Philadelphia Administrative Code was initially enacted in 2003 and amended in January 2019 and required that each District school building obtain a "Certificate of Special Inspection" from the City every year attesting to the fact that the building had been inspected for "fire, safety, electrical, lead paint, water quality, and all other property-related hazards." The Certificate was to be obtained within the nine-month period immediately preceding the school year for which the Certificate would be valid.

37.     In 2022, the City passed the Bill, amending Section A-703 specifically to address asbestos. The Bill requires for the first time that the City's issuance of the required annual Certificates include certification of compliance with a new Section A-703.2(4)(E) addressing asbestos.

38.     The Bill amends Section A-703 to layer on what amounts to a 3-year-and-four-month oversight inspection of the District's existing 3-year federal AHERA re-certification and inspection process; however, unlike the extensive regulations and guidance related to AHERA compliance that provide definitions and guidance, the Bill provides only that the City Health Department or a certified contractor confirm that each school building "is in substantial compliance with the *best practices* for testing, remediation, abatement, cleaning, and management of asbestos, and other property-related hazards not otherwise regulated in this Section." (emphasis added).

39.     The Bill provides no explanation as to how these requirements may be different than existing federal and state requirements. The Bill provides no definition of "best practices" and does not reference any local, state, or federal authority on which the District may rely to understand the aim and content of those best practices. Rather, it appears to require that the

2602127_1.docx

City's Managing Director, currently Tumar Alexander, "identify" these "best practices" only six months prior to the issuance of the Certificates.  To the best of the District's knowledge, the City's Managing Director carries no City, state, or federal qualifications for the inspection, investigation, or management of asbestos or any other environmental hazard, and is not qualified under the City of Philadelphia's own ACR to design or inspect individual asbestos abatement projects.

40.     Section A-703.2(4)(F) added by the Bill further creates a new, yet-to-be formed Facility Safety and Improvement Advisory Group (the "Advisory Group") to make recommendations to the Managing Director regarding these "best practices" for management of asbestos and other undefined "property-related hazards," but there is no requirement that any of the members have any specialized education or training or any recognized credentials.

41.     Rather, the Advisory Group consists of 13-to-15 mayoral appointees, including just one representative of the District. Six of the members are designated to be representatives of various unions, three members are required to be parents, and one a representative of City Council.  One-to-three current District students may be appointed to non-voting positions. There is only one position designated for an "expert" on environmental testing and abatement, but as noted, there is no requirement that the individual meet any federal, state, or City "expert" qualification requirements.

42.     New Section A-703.2(4)(E.1) further requires that the District post online within ten days of receipt the results of "the testing" required by this Section at each school building, but it does not describe any "testing" that will be conducted at school buildings.

43.     For the 2022-23 school year, the City allotted no additional budgeted funds to the District for purposes of supporting the District's ability to comply with the Bill and the new environmental compliance requirements of the Bill and Section A-703.

44.     Already less than one-year from the first compliance deadline of August 1, 2023, there has been no guidance from the City or the Managing Director about what might be included in these "best practices" that must be implemented in more than 300 school buildings containing thousands of rooms and millions of square feet of floor space.  With the City's "best practices" potentially not issued until February 1, 2023, the District will have less than six months to implement any changes required by the "best practices," given that the District also must allow time for the City's inspection and to provide notice to students, parents, faculty, and staff regarding the City's mandated changes, should the City elect not to issue Certificates for particular schools.

45.     Without any guidance or assurances that it will be feasible or possible for the District to comply with the currently non-existent "best practices," implementation and enforcement of the Bill risks the closure of approximately 100 District school buildings for the 2023–24 school year, with the remaining additional 200 buildings slated for possible closure by August 2025, all without the input of the District.

46.     The effect of school closures, particularly in Philadelphia, is profound.  After closure of in-person schooling in March 2020, due to the Covid-19 pandemic, reported calls to Philadelphia's tip line for students whose immediate physical wellbeing or safety was at risk more than doubled, and youth calls to suicide prevention hotlines substantially increased.

47.     Precisely because the closure of school buildings creates such drastic changes for students, teachers, parents, and the District itself, as a matter of law, the District—not the City—

holds the authority to make decisions regarding the opening or closure of District school buildings for instructional purposes.  Similarly, the District—not the City—holds the authority to make asbestos abatement-related decisions as the LEA designated by AHERA to do so.

48.     The Bill and Section A-703 thus exceed the scope of the City's regulatory authority and attempt to unlawfully usurp the District's powers.  This Court should declare the Bill and Section A-703 unconstitutional, null, void, and invalid, and should enjoin their enforcement.

<u>**COUNT I – CONFLICT PREEMPTION**</u>

49.     The foregoing paragraphs are incorporated as if set forth in full in this Count.

50.     AHERA was enacted to establish federal regulations requiring inspection for asbestos-containing material and ACBMs and implementation of appropriate response actions in schools.

51.     Pursuant to AHERA, the United States Environmental Protection Agency ("EPA") has issued dozens of guidance documents describing appropriate procedures for the implementation of AHERA, including inspection, response actions, and re-inspections.

52.     AHERA requires that the LEA "[e]nsure that the activities of any persons who perform inspections, reinspections, and periodic surveillance, develop and update management plans, and develop and implement response actions, including operations and maintenance are carried out in accordance with [AHERA regulations]."  40 CFR § 763.84(a).  It requires that the LEA designate a person to ensure that the regulations are implemented appropriately, pursuant to AHERA regulations, as further explained by EPA guidance.  40 CFR § 763.84(g).

53.     AHERA requires the LEA to inspect its buildings using a certified and accredited inspector, under the standards created by AHERA.  40 CFR § 763.85.

54.     AHERA vests authority in the LEA to select and implement appropriate response actions at regulated buildings.  40 CFR § 763.90.

55.     The Bill and Section A-703, including their duplicative oversight or re-inspection requirements and vague , undefined "best practices," create irreconcilable conflicts with the District's AHERA compliance program and create an obstacle to the successful implementation of AHERA, including by:

a.  Vesting authority in the City's Managing Director to create independent "best practices" for the management of asbestos, with no requirements that the practices be based on technical expertise, science, existing state or federal precedent, or any other appropriate standards determined to be safe and effective;

b.  Vesting authority in the City's Managing Director to create independent "best practices" that remove the discretion from the District, as the designated LEA, or its certified management planner and/or designated person(s) to determine appropriate response actions at District buildings;

c.  Vesting authority for the management of asbestos in an unidentified and yet-to-be-named "Advisory Group" that may be composed of individuals with no background in asbestos inspection, investigation, removal, or management, and no credentials related to the same;

d.  Requiring an independent re-inspection or oversight inspection of the District's existing 3-year AHERA inspection requirements; and

e.  Creating demand for certified asbestos contractors to perform the City's required asbestos inspections of all 300+ District buildings at a time when too few asbestos

13

contractors certified by the City to perform work in Philadelphia are available to satisfy the District's existing AHERA requirements.

WHEREFORE, the Bill and Section A-703 conflict with AHERA and create an obstacle to the District's implementation of AHERA in the irreconcilable ways identified above, and the Bill and Section A-703 must be declared preempted, illegal, null, void, and invalid.

## COUNT II – NON-DELEGATION

56.     The foregoing paragraphs are incorporated as if set forth in full in this Count.

57.     In Article II, Section 1 of the Pennsylvania Constitution, the legislative power of the Commonwealth of Pennsylvania is vested in the General Assembly and is delegated to the municipalities only by limited grant.

58.     The City, its Department of Public Health, and/or the Managing Director have not been delegated authority from the General Assembly to implement asbestos and environmental management procedures for the District that can be demonstrated to be safe, effective, and appropriate.

59.     The Bill and Section A-703 do not reflect the basic policy choices necessary to establish an adequate exercise of legislative power.  The Bill and Section A-703 do not include adequate standards which will guide and restrain the exercise of the delegated administrative functions.  Instead, the Bill and Section A-703 illegally attempt to usurp the Commonwealth's power and place in the hands of the City's administrative agencies, or even the unelected Advisory Board, the blanket authority to establish their own system of asbestos regulation of District schools regarding the highly technical, highly regulated field of asbestos and environmental management, with no intelligible principles to guide their authority.

2602127_1.docx

60.     The Bill and Section A-703 thus place the District and its students at the whim of the Managing Director, the Health Department, and/or the Advisory Board, with less than a year to reach "compliance" with the undefined "best practices," and no intelligible principles to guide the District's efforts at compliance.

WHEREFORE, the Bill and Section A-703 are an unconstitutional delegation of legislative authority and must be declared unconstitutional, null, void, and invalid.

## COUNT III – DUE PROCESS

61.     The foregoing paragraphs are incorporated as if set forth in full in this Count.

62.     The Fourteenth Amendment of the United States Constitution provides that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."  U.S. Const. amend. XIV, § 1.

63.     "Article I, Section I of the Pennsylvania Constitution has been held to be substantially the same as the property protections afforded by the Fourteenth Amendment to the federal Constitution."  *Coover v. Saucon Valley School Dist.*, 955 F.Supp. 392 (E.D. Pa. 1997).

64.     Government regulation violates due process and is illegal if it does not give fair notice to people of ordinary intelligence that their contemplated activity may be unlawful and does not set reasonably clear guidelines for enforcement of the regulation.

65.     "[A] law is void on its face if it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Fabio v. Civil Service Commission of City of Philadelphia*, 489 Pa. 309, 414 A.2d 82, 84 (1980).

66.     The Bill and Section A-703 set vague, ambiguous standards regarding the District's management of asbestos and other environmental hazards to the point that the District

15

has no ability to determine on what basis the City will declare the District's buildings compliant or non-compliant with these local laws.

67.     The Bill and Section A-703 require that the City's Managing Director, who is not trained or certified in any way as an asbestos, lead, or other environmental expert, to identify "best practices" with which the District will be required to comply within as little as six months following the identification of the "best practices."  The Bill and Section A-703 provide no guidance on how the City's Managing Director is to establish the "best practices," and they create apparent authority in an Advisory Group that will be composed of individuals with no requirements themselves of any expertise in asbestos or other environmental issues.

68.     The Bill and Section A-703 do not provide the District with adequate guidance and safeguards to guide the City's claimed authority to close District school buildings, and do not provide the District with adequate guidance to comply with these new and potentially conflicting standards, in violation of the United States Constitution and the Pennsylvania Constitution.

69.     The Bill and Section A-703 set arbitrary standards that attempt to usurp the District's ability to determine appropriate safety and environmental response actions in its own buildings and attempt to usurp the District's ability to determine which District buildings should be open for instruction in any given school year.

70.     The Bill and Section A-703 violate the United States Constitution and the Pennsylvania Constitution by depriving the District of liberty and property without due process of law and are, therefore, invalid, and unenforceable and must be enjoined from application and enforcement.

WHEREFORE, the Bill and Section A-703 violate the United States Constitution and the Pennsylvania Constitution and must be declared unconstitutional, null, void, and invalid.

### COUNT IV – UNLAWFUL REGULATION OF PUBLIC SCHOOLS

71.     The foregoing paragraphs are incorporated as if set forth in full in this Count.

72.     A home rule municipality's powers and limitations are derived from the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. § 2901 *et seq*. and Article IX of the Pennsylvania Constitution.

73.     The Pennsylvania Constitution also guarantees public education as a fundamental right, providing that "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. Art. III, § 14.

74.     Article IX, Section 2 of the Pennsylvania Constitution grants municipalities the right to adopt a home rule charter and limits the powers that can be exercised by a home rule charter.  Section 2961 of the Home Rule Charter and Optional Plans Law, 53 Pa. C.S. § 2961, provides that those powers are limited by the Pennsylvania Constitution, Pennsylvania statutes, or the home rule charter itself.  53 Pa. C.S. § 2961.

75.     Accordingly, the City may not exercise powers contrary to, or in limitation or enlargement of, powers granted by the acts of the General Assembly.  53 P.S. § 13133.

76.     The Pennsylvania Public Education Home Rule Act provides that a home rule school district, like the district, has authority—independent of its creating municipality—for "the administration, management, and operation" of the school district.  53 P.S. § 13218.  It expressly provides that the City may not "enact legislation *regulating* public education or the administration thereof …." 53 P.S. § 13219 (emphasis added).  It is the District's—not the

City's—responsibility to establish suitable physical school buildings spaces for its students. 24 P.S. § 7-701.

77.     In contravention of Pennsylvania law, the Bill and Section A-703 purport to regulate "the administration, management, and operation" of the District, "regulate public education," usurp the District's duty to "provide . . . suitable school buildings" for students in the District, and threaten to infringe upon the fundamental right to public education.

78.     The Home Rule Charter and Optional Plans Law expressly limits home rule municipalities from exercising powers contrary to or in limitation of constitutional and statutory rights and powers.  Accordingly, the Bill is an impermissible exercise of the City's powers as a home rule municipality under the Home Rule Charter and Optional Plans Law and under Articles III & IX of the Pennsylvania Constitution and is, therefore, invalid, and unenforceable and must be enjoined from application and enforcement.

WHEREFORE, the Bill and Section A-703 violate Pennsylvania law and threaten the fundamental right to public education in the Commonwealth of Pennsylvania, and must be declared illegal, unconstitutional, null, void, and invalid.

## COUNT V - DECLARATORY JUDGMENT

79.     The foregoing paragraphs are incorporated as if set forth in full in this Count.

80.     As set forth herein, the Bill and Section A-703 present irreconcilable conflicts with the District's AHERA requirements; they violate the District's constitutional rights under the Fourteenth Amendment; they deprive the District of substantive and procedural due process as preserved by the United States and Pennsylvania Constitutions; they are an impermissible exercise of power under the Pennsylvania Home Rule Charter and Optional Plans Law; and they are an unconstitutional delegation of legislative authority.

2602127_1.docx

81.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 *et seq.*

82.     An actual case and controversy exist as between the City and the District where the City and its Health Department and Managing Director believe that the Bill and Section A-703 are lawful and are attempting to enforce them, and the District contends that both are unlawful, unconstitutional, and invalid, as set forth in this Complaint.

83.     The District is currently and immediately being harmed under the Bill and Section A-703, as the District has less than ten months to modify its extensive and complex existing environmental and asbestos management and compliance programs to meet the City's "best practices."  Any different or additional requirements in the City's "best practices" that deviate from the existing federal and state laws, regulations, and guidance are likely to require substantial time to implement, if possible to implement at all, given the more-than-300 school buildings that the District owns.

84.     Declaratory relief from this Court will terminate the dispute and controversy between the District and the City with respect to the constitutionality, lawfulness, and validity of the Bill and Section A-703.

85.     The District is entitled to a declaratory judgment stating that the Bill is unconstitutional, void and unenforceable, and to specific declarations that: 1) the Bill is void and unenforceable because it is preempted by AHERA; 2) the Bill is void and unenforceable as an unlawful delegation of legislative authority; 3) the Bill is void and unenforceable because it violates procedural and substantive due process rights afforded under the Fourteenth Amendment of the United States Constitution and Pennsylvania Constitution; and 4) the Bill is void and unenforceable because it is an impermissible exercise of power under the Home Rule Charter

and Optional Plans Law, 53 Pa. C.S. § 2301 *et seq*., and an infringement on the fundamental right to public education under the Pennsylvania Constitution.

WHEREFORE, the Bill and Section A-703 create an irreconcilable conflict with AHERA; are an unconstitutional delegation of legislative authority; violate the District's due process constitutional rights; are an impermissible exercise of power under the Pennsylvania Home Rule Charter and Optional Plans Law, and must be declared unconstitutional, null, void, and invalid.

## COUNT VI – PRELIMINARY INJUNCTION

86. The foregoing paragraphs are incorporated as if set forth in full in this Count.

87. The District seeks a preliminary injunction enjoining the City from enforcement of the Bill and Section A-703 including during the pendency of this action.

88. The District is likely to succeed on the merits of this action.

89. Unless the District is granted a preliminary injunction, it will suffer irreparable harm, being subject to the vague and ambiguous Bill and Section A-703 in the months immediately leading to the 2023-2024 school year, risking closure of as many as 100 school buildings for the coming school year, and expending limited funds on a tight budget in an attempt to meet the City's vague, undefined standards to avoid closures.

90. Granting the injunction will not cause harm to the City, the Health Department, or the Managing Director, as the District is already performing inspections, surveillance, removals, and abatements for asbestos and other environmental hazards.

91. Granting the injunction will further the public interest by keeping District school buildings open to serve District students and families.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the District, requests that the Court:

a.       Declare the Bill and Section A-703 vague, unconstitutional, null, void, illegal, and invalid;

b.       Enjoin Defendants, the City, the Health Department, and the Managing Director, from implementing or enforcing the Bill and Section A-703;

c.       Award the District all fees and costs incurred in this action, including all reasonable attorneys' and expert fees pursuant to 42 U.S.C. § 1988; and

d.       Issue to Plaintiff, the District, all other relief that the Court determines to be just and proper.

Dated:  January 20, 2023

*Shoshana Schiller*

_____
Suzanne Ilene Schiller (No. 68206)
Garrett D. Trego (No. 314496)
Danielle Bagwell (No. 309387)
MANKO GOLD KATCHER & FOX LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, PA 19004
sschiller@mankogold.com
gtrego@mankogold.com
dbagwell@mankogold.com
Phone: (484) 430-5700
Facsimile: (484) 430-5711

*Counsel for Plaintiff, the*
*School District of Philadelphia*

2602127_1.docx